CHANCERY.          **Jones' Adm'r. *vs* Perkins.**

APPEAL FROM THE LIVINGSTON CIRCUIT.

*Case 54.*          *Evidence. Insanity. Jurisdiction. Fraud.*

*Oct.* 18.          CHIEF JUSTICE EWING delivered the opinion of the Court.

The case stated. MOSES PERKINS filed his bill against Wm. Jones, his brother-in-law, in 1840, alledging his own insanity from 1826, down to a short time before he filed his. bill, and charging that Jones, during the time of his derangement, had taken possession of a portion of his personal estate, and sold it and disposed of the proceeds ; and had also taken possession of three of his slaves, Minerva and Rachel, two girls, and Patsey, a woman, at different times, under the pretence of a purchase of them from him, and now retains the whole of them, with four children, which Patsey has had since Jones obtained the possession of her. He prays that the pretended contracts of purchase be set. aside, and that Jones be required to deliver up the slaves, and Patsey's increase, with hire, and account for the personal property sold.

Answer of Jones. Jones answered, denying the insanity of the complainant, as charged, and every material allegation of the bill, and alledging a fair purchase, of the slaves at their full value, upon the urgent solicitation of the complainant and his friends, as necessary to raise the means to pay his debts, and relieve him from pressing embarrassment, and his property, from inevitable sacrifice ; and that his personal property was sold for the same purpose, in pursuance of his own and wife's advertisement; and he had nothing to do with it, except to aid in drawing the notes of the purchasers, which were delivered over to him by the complainant

for safe keeping only, and were all delivered back to him about the time they fell due. That he never collected a dollar of the amount, but the whole was paid to Perkins himself, by the purchasers of his property. He relies upon the lapse of time, and exhibits bills of sale for Minerva, bearing date the 6th November, 1826, and of Patsey, bearing date the 4th day of June, 1832, and the assignment of a mortgage from one Perry to him, for Rachel, and a re-execution of a mortgage to him for her, bearing date in November, 1830, signed and sealed by the complainant and Perry, to secure one hundred dollars, advanced by Jones to Perry, who held a mortgage on both Patsey and Rachel, to secure a sum of money previously loaned by him to Perkins; and alledges that every dollar of the amounts paid, on said purchases and mortgage, were advanced in payment of Perkins' existing and pressing debts.

The Circuit Court rendered a decree against Jones' estate, (he having died in the progress of the case,) for the amount for which the personal estate was sold, dissolved the contract of purchase for all the slaves, and directed their delivery, with their increase, to the complainant, upon his refunding the consideration, with interest, upon a day given, after deducting the sum decreed against the defendant for the personal estate sold. And upon the complainant's failing to refund, so many of the slaves as were necessary, were ordered to be sold for the amount, and the residue delivered to the complainant. Jones' administrator has appealed to this Court.

A number of witnesses have been examined on both sides, and a mass of evidence adduced, the most of which consists in the mere expressions of opinion by the witnesses, without a single fact detailed, upon which the opinion is founded. This species of evidence, it has often been said by this Court, is entitled to little or no weight in the proof of insanity.

Eliciting from the mass of evidence what can be collected, as bearing on the subject, we have come to the conclusion, that as early as the year 1826, the complainant was seized with an alienation of his faculties, and at times was subject to fits of actual delerium, and for a

Margin notes:

JONES' ADM'R.
vs
PERKINS.

Decree of the Circuit Court.

The opinions of witnesses as to insanity are entitled to very little or no weight.

Where an individual, from intemperance, was subject to temporary derangement, with the assent of his family & friends,

JONES' ADM'R.
vs
PERKINS.

sold property at
a full price to
pay his debts
then pressing
him, at a time
when not under
the influence of
such alienation
of mind, held that
his contracts
were binding.

time deprived of all rationality, and not subject to rational control, and that his delerium was brought on him by excessive intemperance. That he continued occasionally to be subject to spells of delerium, but less violent in their character, and less and less frequent, as time ran on, down to Jones' purchase of the last slave, Patsey, in 1832, and afterwards. But in the general, during the whole period, and especially when not under the inflence of ardent spirits or its effects, was capable of attending, and did attend to his own farm and business; was a good judge of property, and was capable of trading with reasonable prudence and discretion. That about the time of the sale of his personal property and of the slave Minerva, he was not a maniac, destitute of mind, but had not so entirely recovered from his first violent attack, as to be capable of conducting the sale or attending to such business, without the aid of his friends and relations. That he was involved in numerous small debts, some of which were pressing upon him, and his property liable to be sacrificed; and upon consultation, it was concluded to be best, by his brother and brother-in-law; Jones, concurred in by himself and wife, that a portion of his personal property should be sold and the proceeds applied to the payment of his debts, and he and his wife joined in an advertisement of the sale. His brother and brother-in-law, Jones, attended the sale and aided in the same. The amount secured by the sale not being sufficient to pay his debts, Jones was persuaded to buy the girl Minerva, then about five or six years of age. He agreed to do so upon the condition only, that she should be valued by two disinterested neighbors of Perkins, and he would take her at valuation, which was agreed to, and she was valued at $160 in silver. Jones paid $200 in Commonwealth paper, in the payment of his debts, a few dollars more than her valuation, and took a bill of sale for the girl from the complainant, and possession of her. At the time of the execution of the mortgage for Rachel, and of the sale of Patsey, there is no evidence of the insanity of Perkins, but on the contrary, it appears from the evidence of his own sister, who was present at the first interview about the sale of the latter, that her brother

was entirely rational, and was engaged at the time in stocking a plow; and she is corroborated by other witnesses, in her statement of his rationality and capacity to attend to any ordinary business about this time, except when intoxicated. She states that Perkins urged upon Jones the purchase of the slave Patsey, as he was the owner of her children, which was agreed to, reluctantly, by Jones, and only upon the condition that the sale was entirely satisfactory to his wife. And all concur in stating that he paid her full value at the time. The money was paid in satisfaction of Perkins' debts, to pay which, was his object and urgency for selling.

With the foregoing view of the facts, we cannot doubt but that the Circuit Court erred in the decree which was rendered. There is no foundation for the decree against Jones as to the personal property; he admits it is true that the notes remained in his hands a short time on deposit by Perkins, for safe keeping, but he alledges he re-delivered them to him, and there is not a particle of evidence that he ever collected one dollar of the amount, nor that one dollar ever came to his hands; but on the contrary, as showing the fact that they must have been re-delivered to Perkins, it is proven by several of the witnesses, and especially by his brother, who purchased the largest amount of property, that they made payment to Perkins, which it is not presumable they would have done, had he not held their notes.

As to Minerva, purchased by Jones in 1826, we would remark, that Courts of Equity exercise jurisdiction to annul the contracts of idiots, lunatics, and others who are *non compus mentis*, on the ground of fraud. It is true the fact of fraud may be implied from the dealing with them, knowing their incapacity of mind. But even in cases of absolute insanity, where the evidence is full and complete of entire good faith, and the contract is shown to be just and proper and for the benefit of those unfortunate persons, as for necessaries, Courts of Equity will not interfere, and the more especially, when their imbecility is brought on themselves by their own intemperance: (1 *Story's Equity*, 233-4, &c.) and the authorities referred to. Much less will the Court interfere

*Marginal note:* Courts of Equity exercise jurisdiction to set aside contracts made with idiots and lunatics. on the ground of fraud, which may be implied from dealing with them, knowing their incapacity; but where the evidence of good faith is full, and the contract beneficial to the unfortunate person, the Chancellor will not interfere.

in a case like the one before us, where the complaining party was not entirely destitute of mind when the contract was made, but assented, and was capable of assenting to the sale, and it was made by the advice and approval of his brother, who took a deep interest in his affairs, and upon the valuation of the disinterested neighbors of the complainant, and was necessary and proper, to pay his debts, and save perhaps the very property sold from sacrifice under the hammer, or other property more necessary for the support and necessary sustenance of his family; and the more especially, when his imbecility of mind was brought upon himself, and perhaps the debts upon his estate, by his own drunkenness, and when, though he has had many and long intervals of rationality and capacity to attend to his business, and must have been well apprised of the sale and the terms, and the possession of the slave by Jones, and the application of the proceeds, acquiesced in the same for fourteen years, without complaint, and until the slave is raised from infancy to womanhood, at the risk of Jones. While the Court will reach out its arm as a shield and protection to such unfortunate persons, against fraud, circumvention, and imposition, it never will aid them in using their own calamity, and especially when brought upon themselves, as the instrument and means of injury and injustice to others.

*—And especially after a great lapse of time, during which there had been intervals of sanity, and he knew the situation of the transaction, & that the price had been paid out in discharge of his debts.*

Indeed, it may be well questioned whether the statutes of limitation do not oppose a bar to his recovery. We are compelled to believe that many and long intervals of sanity must have occurred, long before the commencement of five years before the institution of his suit, and if they did, the saving in the statute in favor of persons *non compus mentis*, would no longer apply in his favor; the statute would commence running, and when it commenced it would run on and not stop, it is presumed, by a return of his paroxysm of insanity. Be this as it may, we are perfectly clear that he has made out no just ground for the interposition of the Chancellor, in the annulment of his sale of Minerva.

*When the statute of limitation begins to run, its operation is not suspended by insanity.—Argu.*

And as to the sale of Patsey, we think he has still less ground for relief. At the time of that sale, he was capa-

*Though one's mind may be im-*

ble of contracting. Though his mind had been weaken- <span style="float:right">Jones' Adm'r.<br>*vs*<br>Perkins.</span>
ed no doubt, by intemperance, he was not destitute of
capacity to understand his rights, to judge of the value of
property, and to make a discreet and prudent bargain;
and it is not the province of the Court to measure the ca-
pacities of men, nor to relieve the weak minded from
their bargains, whenever they may chose to ask it, merely
on the ground of their weakness of mind. The Chancel-
lor, in such cases, will scan the transaction with more
vigilent scrutiny, and lend a more ready ear to the evi-
dences of circumvention, contrivance, or fraud, but when
none exists in the transaction, but on the contrary, the
bargain, as in the case of the purchase of Patsey, is found
to be fair, honest, and just, for an adequate consideration,
and procured without trick or contrivance, he will not,
and ought not to interfere. He is not made the guardian
of weak minded persons; if he were to assume jurisdic-
tion on that ground, he would have enough to do. Upon
the whole, we are satisfied that there is no ground or reas-
onable pretence for annuling the sale of Patsey.

*paired by intemperance, yet if he have capacity to judge of the value of his property and make a discreet bargain, his contracts will be binding.*

As to the girl Rachel, she has been held by Jones, in
*quasi trust*, under the mortgage, to secure the re-payment
of one hundred dollars loaned. There is no evidence
that Jones ever asserted absolute ownership or claimed
to hold her adversely, or otherwise than under the mort-
gage. The statute of limitation will not, therefore, bar
Perkins' right to redeem her upon the usual terms, of re-
funding principal and interest. He is not entitled to an
abatement of any portion of the amount on account of
the hire. The compensation for raising the girl is, at
least, equal to the hire. Nor is Jones entitled to any
remuneration for the rent of the old place, or the price of
the hoop poles, or other claims for services, &c. These
were bestowed at the time, as gratuities, as we conceive,
and should not, at this distant day, be brought up as
charges.

The decree of the Circuit Court is reversed, and cause
remanded, that a decree may be rendered as indicated in
this opinion.

*Cates & Lindsey* for appellant: *Goodloe* for appellee.